J-A13021-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JAMIE LYNN SILVONEK :
:
Appellant : No. 818 EDA 2016

Appeal from the Judgment of Sentence February 11, 2016
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s):  CP-39-CR-0002141-2015

BEFORE:   LAZARUS, J., OTT, J. and FITZGERALD, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED AUGUST 09, 2017**

Jamie Lynn Silvonek appeals from the judgment of sentence imposed on February 11, 2016, in the Court of Common Pleas of Lehigh County, following her entry into a negotiated guilty plea to first-degree murder and related charges.  Silvonek, a 14-year-old at the time of the crime, and her 20-year-old boyfriend, Caleb Barnes, killed Silvonek's mother, who had attempted to put an end to their relationship.  Prior to the guilty plea, Silvonek petitioned the court to have her case decertified so that she could be adjudicated in juvenile court.  Following a two-day hearing, the trial court denied Silvonek's motion to transfer.  She subsequently entered into the negotiated guilty plea mentioned above and was sentenced to 35 years'

_____

[*] Former Justice specially assigned to the Superior Court.

incarceration to life, as agreed. In this timely appeal, Silvonek claims the trial court erred in denying her petition to transfer to juvenile court by requiring her to self-incriminate to demonstrate her ability to rehabilitate, misapplying several of the statutory factors, and in basing its determination on bias, prejudice, and/or ill will. After a thorough review of the submissions by the parties, the certified record, and relevant law, we affirm.

Pursuant to statute, murder is exempt from classification as a delinquent act. *See* 42 Pa.C.S. § 6302, definition of "Delinquent act (2)(i)." Accordingly, pursuant to 42 Pa.C.S. § 6322, a juvenile charged with murder must petition the trial court for transfer to the juvenile system. In order to prevail, the juvenile has the burden to prove by a preponderance of the evidence that the transfer will serve the public interest. *See* 42 Pa.C.S. § 6322. This determination, in turn, is made by the trial court by considering the factors listed in section 6355(a)(4)(iii). Those factors are:

> (iii) that there are reasonable grounds to believe that the public interest is served by the transfer of the case for criminal prosecution. In determining whether the public interest can be served, the court shall consider the following factors:
>
> (A) the impact of the offense on the victim or victims;
>
> (B) the impact of the offense on the community;
>
> (C) the threat to the safety of the public or any individual posed by the child;
>
> (D) the nature and circumstances of the offense allegedly committed by the child;
>
> (E) the degree of the child's culpability;

(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and

(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:

　　(I) age;

　　(II) mental capacity;

　　(III) maturity;

　　(IV) the degree of criminal sophistication exhibited by the child;

　　(V) previous records, if any;

　　(VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;

　　(VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;

　　(VIII) probation or institutional reports, if any;

　　(IX) any other relevant factors;

42 Pa.C.S. § 6355(a)(4)(iii).

Our standard of review is as follows:

Decisions of whether to grant decertification will not be overturned absent a gross abuse of discretion. An abuse of discretion is not merely an error of judgment but involves the misapplication or overriding of the law or the exercise of a manifestly unreasonable judgment passed upon partiality, prejudice or ill will.

***Commonwealth v. Ruffin***, 10 A.3d 336, 338 (Pa. Super. 2010) (citations omitted).

The underlying facts of this matter are particularly important to the disposition of this matter and must be understood to provide the needed context to the trial court's determination and our ruling. The trial court clearly understood this necessity and provided approximately 22 pages detailing the factual underpinnings of this matricide.[1] We rely upon this recitation of the facts and direct the parties to attach a copy of the trial court opinion in the event of further proceedings.

Here, we simply note that Silvonek was the instigator and willing participant in the murder of her mother,[2] who was standing in the way of a continuing sexual relationship between Silvonek and her adult boyfriend, Caleb Barnes, a soldier stationed at Fort Meade, Maryland.

_____

[1] ***See*** Trial Court Opinion, 11/19/2015, at 2-24.

[2] Texts from Silvonek to Barnes on the day they killed her mother capture the essence of this. 1) "She needs to go, Caleb. Right now. You don't understand"; 2) "CALEB" "I'M SERIOUS" "She's lying" [about Silvonek's age] "Please do it, I'm going to throw up" "I can't stand her lying to you like this"; 3) "I don't know what her problem is" "She threatened to throw me out of the house. I want her gone."; 4) "I just need to you be able [sic] to come over so we can do whatever necessary, honestly"; 5) "I want her to shut her fucking face and stop being fake. She just God damn lied to you about my age and now she's pulling this shit." ***See*** Commonwealth Exhibit 8, 10/29/2015, Texts, 3/14/2015.

Silvonek's first argument is that the trial court abused its discretion denying decertification by violating Silvonek's fifth amendment right against self-incrimination. One of the statutory factors for the trial court to consider is amenability to treatment in the juvenile system. Case law demonstrates that a component of that determination can be whether the juvenile takes responsibility for his or her actions. While taking responsibility may be considered, the court cannot require the juvenile to admit to guilt in order to prove he or she has taken responsibility. **See Commonwealth v. Brown**, 26 A.3d 485 (Pa. Super. 2011). If the court does use the failure to admit guilt to determine the juvenile is not amenable to rehabilitation, the juvenile's fifth amendment right against self-incrimination has been violated. **Id**. Our review of the certified record shows that while the trial court did consider Silvonek's lack of acceptance of responsibility for her actions, it did not require her to admit her crime. Rather, in its Pa.R.A.P. 1925(a) opinion, the trial court credited forensic psychiatrist, John S. O'Brien, M.D., J.D., who determined, "In [Silvonek's] version, she 'minimize[d] her problems and overlook[ed] personal fault,' by 'continuing to distance herself from any responsibility for the offense.'" Trial Court Opinion, 11/19/2015, at 31-32.

The foregoing was not a statement faulting Silvonek for her failure to admit to her crime. Instead, this comment is part of larger commentary indicating Silvonek, even at her young age, had become an adept liar and emotional manipulator of those around her. In using these traits, she was attempting to avoid responsibility and consequences of her actions. Indeed,

the record reflects Silvonek has been described by those around her as a "chameleon", *id*. at 29, "socially savvy", "a psychological bully", and a "manipulator". *Id*. at 32. Additionally, the record is replete with instances where Silvonek changed her story and attitude in response to her situation. The video of Silvonek's voluntary interview with the police, immediately after she was taken into custody, is ample demonstration such behavior.[3]

In reviewing the entire record, it is clear that the determination that Silvonek avoided responsibility of her actions was not based upon her failure to admit guilt. She did, in fact, admit to certain aspects of her criminal behavior in the police interview. Specifically, she admitted to minimally helping Barnes dispose of her mother's body. Our review of the certified record, *in toto*, confirms that the trial court's determination that Silvonek's failure to accept responsibility for her actions was not based upon a refusal to admit guilt. Rather, the determination was based upon her actions viewed in their entirety. Silvonek is not entitled to relief in this issue.

Next, Silvonek argues the trial court improperly considered certain of the required factors in denying her motion for decertification. She claims the trial court considered her age and her relationship with co-defendant,

_____

[3] Particularly relevant to this issue, we note: 1) how Silvonek attempted to blame a friend of hers, Witness One, for giving Barnes the idea of killing her parents, and 2) how Silvonek claimed Barnes had forcibly raped her after killing her mother. This court has viewed the interview, as well as all other available video evidence, in its entirety.

Caleb Barnes, as aggravating factors rather than as mitigating factors. Specifically, she claims, "The trial court failed to consider the inherent coerciveness of Jamie Silvonek's relationship with a twenty (20) year old co-defendant when Jamie Silvonek had not reached the age of consent and had just turned fourteen (14) years old." Appellant's Brief at 24. While the certified record does reflect expert testimony was presented to support this theory, specifically the testimony of Dr. Frank Dattilio, Ph.D., and Dr. Steven Berkowitz, M.D., the trial court considered the testimonial evidence of both experts and rejected them. The trial court reasoned that the primary foundation of Dr. Dattilio's opinion was admittedly based upon Silvonek's "unreliable recounting and version of events." Trial Court Opinion at 27. The trial court further stated, regarding Dr. Dattilio's reliance on Silvonek's version of the events:

> Indeed, this Court recognizes that [Silvonek] has presented many different versions of the events, as they are constantly changing. Of prime importance, Dr. Dattilio based his opinion on the fact that [Silvonek] did *not* execute the killing of her mother, was surprised by the killing, and was an *unwilling* participant in it. However, [Silvonek's] text messages between [her] and the Co-Defendant, the Walmart video (not reviewed by Dr. Dattilio), the Lehigh County Jail letter (not reviewed by Dr. Dattilio prior to preparing his report), as well as her telephone conversation with Co-Defendant in the presence of Witness Number One as recounted in the Preliminary Hearing testimony, undermine this assertion.

*Id*. at 27-28 (footnotes omitted).

Dr. Berkowitz opined that due to Adolescent Brain Development, Silvonek exhibited poor judgment and should not be held to the same legal

standard as an adult. He further testified that Silvonek suffered from a non-verbal learning disability. However, the trial court noted that although Dr. Berkowitz interviewed Silvonek while she was in the Lehigh County Jail and reviewed the battery of diagnostic assessments performed by Dr. Dattilio, he did not review Silvonek's school records, the Walmart video,[4] the approximately 6,000 text messages between Silvonek and Barnes, the psychiatric report of Dr. John F. Campion, M.D.[5], the sexual assault report of Dr. Debra Jenssen, M.D.,[6] the social media sites used by Silvonek, and without having interviewed any of Silvonek's teachers.

_____

[4] The Walmart video is closed circuit video from the Walmart store Silvonek and Barnes visited to buy cleaning supplies after they had killed Silvonek's mother and left her in the Silvonek vehicle in the driveway. The video shows, in part, Silvonek and Barnes walking arm in arm; Silvonek pulling on Barnes' arm, directing him down a specific aisle; and Silvonek carrying a bottle of what appears to be bleach, swinging it as if it were a sand pail at the beach. The Lehigh County Jail letter was a note Silvonek attempted to send to Barnes regarding her decertification hearing in which she asks him to take the blame for her, claiming that if the situation was reversed, she would "be on the stand at that hearing, taking the fall for you." Trial Court Opinion. 11/16/2015, at 28, fn. 14. In the letter, she further claims "…the only hope of us ever being together is if I get sent back to Juvenile Court. After 7 years I can move to wherever you are, and we can be together." *Id*. Finally, Witness One is the friend referred to earlier to whom Silvonek tried to shift blame. The phone call was one between Silvonek and Barnes, in the presence of Witness One, in which Silvonek suggested Barnes kill her mother.

[5] Dr. Campion was Silvonek's therapist prior to the murder.

[6] This report was generated after Silvonek, during her police interview, accused Barnes of having forcibly raped her.

In light of the above, we see no abuse of discretion by the trial court in rejecting these expert opinions.[7] Rather, the trial court found the testimony of John S. O'Brien, M.D., J.D., to have been credible. The trial court noted that Dr. O'Brien had both interviewed Silvonek and thoroughly reviewed the records:

> [Dr. O'Brien] found that [Silvonek] "seamlessly adjust[ed]" her story and provided multiple versions of what took place on the evening of March 14, 2015 and early morning hours of March 15, 2015. In [Silvonek's] version, she "minimize[d] her problems and overlook[ed] personal fault," by "continuing to distance herself from any responsibility for the offense." [Silvonek] was found to be "a good liar and had successfully lied on multiple occasions in order to get what she wanted." She was seen by others in the community as being "socially savvy," "a psychological bully" and a "manipulator." Overall, [Silvonek] presented herself differently to different people in order to achieve her end goal. Indeed, during the course of her therapy with Dr. John Campion, [Silvonek] ironically was seen as having "a significant improvement in her symptoms" at a time when "her actual performance and participation in school activities deteriorated" and her relationship with her parents was contentious.
>
> Dr. O'Brien found [Silvonek] to be "a highly intelligent and manipulative young woman" who was not a "fearful or emotionally overpowered passive participant in the pre-planned, premeditated murder of her mother." Dr. O'Brien concluded that [Silvonek] was "an individual who could size up her audience and behave in a manner that was consistent with their interests and

---

[7] Although the trial court did note that Dr. Dattilio testified that if, contrary to his belief, Silvonek did plot, encourage, and participate in the murder of her mother, then then it would *not* be in the public interest to decertify. Trial Court Opinion, 11/16/2015, at 30, fn. 15. As the trial court determined Silvonek was the instigator and a willing participant in the killing, the trial court accepted this aspect of Dr. Dattilio's testimony.

their receptiveness to her self-serving and ingratiating representation of herself."

*Id*. at 31-32 (citations to the record omitted).

The trial court accepted Dr. O'Brien's expert testimony that Silvonek was a manipulator, not manipulated. As noted, we have reviewed the video evidence, read the expert reports and testimony, and reviewed the text messages between Silvonek and Barnes and we find no abuse of discretion in this determination. Accordingly, Silvonek is not entitled to relief on this issue.

The last factor Silvonek claims the trial court erred in analyzing was the determination that juvenile dispositional alternatives were inadequate to address both society's and Silvonek's needs and that Silvonek was an unlikely candidate to be rehabilitated prior to the expiration of the juvenile court jurisdiction.[8] Here, the trial court considered the evidence that the two programs available to Silvonek had never treated anyone for more than 2½ years, making it likely that Silvonek would be released from such program well before her 21st birthday. Given the extreme nature of the crime, including her willing participation in it, as well as Silvonek's general lack of amenability for rehabilitation, the trial court reasoned:

> As such, this Court finds that the juvenile system is inadequate to supervise, treat or rehabilitate [Silvonek]. This Court recognizes that juvenile court jurisdiction ends at the age of twenty-one (21) regardless of whether or not [Silvonek]

_____

[8] The claim relates to the factors at 42 Pa.C.S. § 6355 (F) and (G)(vii).

continues to pose a threat to society. However, it is more likely than not that [Silvonek] would be released long before she attains the age of twenty-one (21) years old, as the treatment facilities are designed with a shorter duration of treatment in mind. A period of approximately two and a half (2½) years is woefully inadequate to expect that [Silvonek] would respond to treatment or rehabilitation after committing matricide.

In contrast, within the adult system, a state correctional institution is available to [Silvonek] that would suit her needs. Specifically, SCI Muncy is a state correctional institution housing youthful female offenders younger than eighteen (18) years old, and young adult female offenders between the ages of eighteen (18) and twenty-one (21). The juvenile programing within the adult correctional system offered at SCI Muncy mirrors the programming for juvenile offenders offered at both North Central Secure Treatment Unit and Adelphoi Village. William Franz, the Correction Classification Program Manager and SCI Muncy, explained that the youthful offender and young adult prisoners are separated from the general prison population. The Youthful Offender Program offers a great deal of programs designed to be therapeutic in nature. The prisoners in this program meet with their counselors and psychologists daily, and overall there is [a] great deal of interaction with the staff. In this program, the prisoner would receive an education and be offered programs run by area Universities. Under the Young Adult Offender Program, the prisoner undergoes a five (5) phase program, each phase lasting eight (8) weeks. A young adult prisoner would have the opportunity to participate in a myriad of programs which focus on, *inter alia*, positive relationships, coping skills, decision making and positive self-esteem. Mr. Franz indicated that the programs in SCI Muncy are similar to those offered at North Central Secure Treatment Unit in Danville, Pennsylvania. However, M. Franz noted that it is less chaotic at SCI Muncy because they have more options available to them to deal with rule breakers. Consequently, he believed SCI Muncy to be a placement that is more conducive to treatment.

Trial Court Opinion, at 35-36.

This rationale belies Silvonek's claims that the trial court based its decision simply on the belief that as a juvenile offender Silvonek would be

released in two and one-half years. Contrary to Silvonek's claims, we believe the trial court engaged in a thoughtful analysis of this issue before determining that Silvonek would be more appropriately served by the adult correctional facilities.

Finally, Silvonek argues the trial court abused its discretion by basing its determination on partiality, prejudice or ill will. Essentially, Silvonek argues, "The lower court found [Silvonek] effectively guilty of all alleged charges before a trial even commenced. Such findings clearly demonstrate partiality, prejudice or ill will towards Juvenile Jamie Silvonek." Appellant's Brief at 29.

We note that Silvonek has cited **Commonwealth v Brown**, 26 A.3d 485 (Pa. Super. 2011) favorably throughout her brief. As discussed above, we have found **Brown** inapplicable under the facts of this case regarding Silvonek's self-incrimination claim. However, the **Brown** decision also states:

> Consistent with our discussion above permitting a psychiatrist to presume a juvenile's guilt in determining amenability to treatment, we conclude that for purposes of analyzing the factors in § 6355(a)(4)(iii), a trial court may (but need not) assume that the juvenile is guilty and committed the alleged acts constituting the offense.

**Commonwealth v. Brown**, 26 A.3d at 508.

Case law specifically permits the trial court to presume the juvenile's guilt when considering decertification. Accordingly, this argument is unavailing.

- 12 -

Our review of this matter convinces us that this is an extraordinary case.  Jamie Lynn Silvonek was still a young teenager when she conspired with her 20 year old boyfriend to murder her mother in order to continue their relationship.  Nonetheless, the trial court carefully considered the totality of the evidence and applied the facts to the statutory factors listed at 42 Pa.C.S. § 6355(a)(4)(iii).  In doing so, the trial court determined, despite her age, Silvonek was not amenable to rehabilitation in the juvenile system and that the adult system would be better able to provide her with the help she requires.  Accordingly, the trial court found that Silvonek had not carried her burden to prove that a transfer to the juvenile system would serve the public interest.  Our comprehensive review of the certified record in this matter confirms that the trial court did not abuse its discretion in denying Silvonek's motion to transfer to juvenile court.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/9/2017

- 13 -

# IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA

## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    )
    )
vs.    )    Case No. 2141/2015
    )
JAMIE LYNN SILVONEK,    )
    Defendant    )

\* \* \* \* \* \* \* \*

APPEARANCES:

> JEFFREY S. DIMMIG, ESQUIRE,
> CHIEF DEPUTY DISTRICT ATTORNEY,
>     On behalf of the Commonwealth
>
> JOHN J. WALDRON, ESQUIRE,
> MICHAEL STITT, ESQUIRE,
>     On behalf of Defendant

\* \* \* \* \* \* \* \*

### OPINION

MARIA L. DANTOS, J.

Defendant, Jamie Lynn Silvonek, has been charged with Criminal Homicide,[1] Criminal Conspiracy to Commit Homicide,[2] Tampering with Evidence,[3]

---

[1]     18 Pa C.S.A. § 2501.
[2]     18 Pa C.S.A. § 2501; 18 Pa. C.S.A. § 903.
[3]     18 Pa C.S.A. § 4910(1).

A-2

and Abuse of Corpse.[4]  Presently before this Court is Defendant's Motion to Transfer Proceedings to Juvenile Court[5].  42 Pa. C.S.A. § 6322.  A hearing relative to Defendant's Motion to Transfer Proceedings to Juvenile Court was conducted before this Court on October 29, 2015 and November 2, 2015.  At the evidentiary hearing, the Defendant presented the testimony of Frank M. Dattilio, Ph.D., Lehigh County Juvenile Probation Officer Lisa Costello, and Steven Berkowitz, M.D.  At this hearing, the Commonwealth introduced the testimony of Barbara Bollinger, M.D., John O'Brien, M.D., Correction Manager at SCI Muncy William Franz, Lehigh County Jail Correction Officer Emily Cramer, Parkland School District teacher Diane Haberstroh, and a co-worker of the victim, Deborah Belles.  Pursuant to the requests of counsel, this Court is also considering the evidence presented at the hearing held on October 28, 2015, relative to Defendant's Omnibus Pre-trial Motion.  Additionally, this Court reviewed the Preliminary Hearing transcripts from May 14, 2015, before Magisterial District Justice Michael Faulkner, and all exhibits appended thereto.  Furthermore, this Court reviewed the videotaped interviews of both of the Co-Defendants.

---

[4]      18 Pa C.S.A. §5510.

[5]      Although the Defendant was fourteen (14) years of age at the time of this offense, murder is excluded from the Juvenile Act.  Indeed, the legislature has determined that certain crimes are so heinous that the perpetrators are to initially be treated as adults.  "Murder, the most heinous crime, falls squarely into that category...." Commonwealth v. White, 818 A.2d 555, 567 (Pa. Super. 2003).  Therefore, only by requesting "decertification" can the Defendant's case be considered for the jurisdiction of the juvenile division. Commonwealth v. Beasley, 763 A.2d 910, 911 (Pa. Super. 2000). Unless the Defendant meets the burden of proof, the murder disqualifies her from the benefits of the juvenile court's jurisdiction.

2

A- 3

Initially we note that at a decertification hearing, the defendant bears the burden to establish by a preponderance of the evidence that the transfer will serve the public interest. 42 Pa. C.S.A. § 6322(a); see also Commonwealth v. Sanders, 814 A.2d 1248, 1250 (Pa. Super. 2003). To resolve the question of whether the defendant has satisfied her burden of proof, consideration must be given to the factors enumerated in the Juvenile Act, 42 Pa. C.S.A. § 6355(a)(4)(iii). The factors contained in Section 6355(a)(4)(iii) are the following:

> (A) the impact of the offense on the victim or victims;
> (B) the impact of the offense on the community;
> (C) the threat to the safety of the public or any individual posed by the child;
> (D) the nature and circumstances of the offense allegedly committed by the child;
> (E) the degree of the child's culpability;
> (F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and
> (G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:
>
> (I) age;
> (II) mental capacity;
> (III) maturity;
> (IV) the degree of criminal sophistication exhibited by the child;
> (V) previous records, if any;
> (VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;
> (VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;
> (VIII) probation or institutional reports, if any;
> (IX) any other relevant factors.

3

A-4

42 Pa. C.S.A. § 6355(a)(4)(iii). While the Juvenile Act requires that a decertification court consider all of the amenability factors, it is silent as to the weight assessed to each by the court. Commonwealth v. Jackson, 722 A.2d 1030, 1033 (Pa. 1999); Sanders, 814 A.2d at 1251. The ultimate decision whether to decertify a matter to Juvenile Court lies within the sole discretion of the decertification court. Jackson, 722 A.2d at 1034. See also Commonwealth v. Coto, 562 Pa. 32, 753 A.2d 217, 222 (2000).[6]

The incident which brought about this prosecution is alleged to have occurred on March 15, 2015. On this date, Lieutenant Michael Sorrentino of the South Whitehall Township Police Department received a call from his supervisor that Officers had been dispatched to the 5700 block of Haasadahl Road, Allentown, South Whitehall Township, Lehigh County, Pennsylvania, for a suspicious vehicle with blood inside, but when they arrived, the vehicle was gone. (Preliminary Hearing of May 14, 2015, hereinafter referred to as "PH," 9-11, 31). However, the Officers noted what appeared to be a shallow grave along the creek. (PH 10); (PH C. Ex. 1); (PH C. Ex. 4). Lieutenant Sorrentino instructed that the area be secured and advised that he would be there shortly. (PH 13).

Lieutenant Sorrentino arrived on scene at approximately 5:00 A.M. (PH 14). It was still dark outside and there was snow on the ground. (PH 14). The Fire Department was also on scene and had set up exterior lighting. (PH 14).

---

[6] While a decertification court must consider all of the factors set forth in 42 Pa. C.S.A. § 6355, it need not address, in seriatim, the applicability and importance of each factor and fact in reaching its final determination. Jackson, 722 A.2d at 1034.

4

Lieutenant Sorrentino acquired from the Fire Department a thermal imaging camera in order to scan the area of the suspected shallow grave. (PH 16-17). Using this device, Lieutenant Sorrentino could discern a torso and the faint outline of an arm. (PH 17). While Sergeant Edelheiser illuminated the area with a flashlight, Lieutenant Sorrentino used a shovel to begin digging away the dirt. (PH 18). When two (2) legs became visible as a result of his digging, he immediately contacted other authorities for assistance. (PH 18); (PH C. Ex. 2); (PH C. Ex. 3).

Immediately thereafter, Lieutenant Sorrentino learned that the suspicious vehicle was located approximately one (1) mile away, at the edge of a pond in South Whitehall Township. (PH 19, 23, 29); (PH C. Ex. 5); (PH C. Ex. 6); (OPTM 8-9). The vehicle was located in the area of Applewood Drive and Huckleberry Road. (PH 35); (PH C. Ex. 5); (PH C. Ex. 6); (OPTM 8-9). The ignition of the vehicle was turned on and the lights were still on. (PH 19, 35, 38, 103); (OPTM 9). In addition, there was a significant amount of blood inside of the cabin portion of the vehicle, primarily in the front driver's and the front passenger's compartments. (PH 19, 39). The registration on the plate revealed that the owners of the vehicle were Dave and Cheryl Silvonek, who lived at 1516 Randi Lane in Upper Macungie Township, Lehigh County, Pennsylvania. (PH 20, 23, 39-40, 104); (PH C. Ex. 6); (OPTM 9-10).

Lieutenant Sorrentino acquired a JNET photograph of Cheryl Silvonek. (PH 24, 28). Based on this photograph, preliminarily, the woman in the shallow grave was then identified as Cheryl Silvonek. (PH 28).

5

At approximately 6:00 A.M. on March 15, 2015, Detective Richard Heffelfinger of the Lehigh County District Attorney's Office, assigned to the homicide task force, was called to the scene for a "suspicious death." (PH 33-34, 102); (OPTM 6-8). He arrived at 6:45 A.M. (PH 34). After viewing this scene and speaking with Lieutenant Sorrentino, Detective Heffelfinger proceeded to the Silvonek residence to assist the other law enforcement agencies. (PH 40, 104, 128); (OPTM 8). Upper Macungie Township Officers and South Whitehall Township Officers were already in route to the Silvonek residence. (PH 40, 104); (PH C. Ex. 7); (OPTM 10). Several officers then attempted to make contact with anybody inside the residence by knocking on the front door. (PH 40-41); (OPTM 10-11).

David Silvonek responded. (PH 41); (OPTM 11). He had been sleeping and indicated that he did not think that anyone else was home at that time. (PH 42). Mr. Silvonek granted permission for the Officers to search the residence. (PH 42); (PH C. Ex. 7). When Detective Heffelfinger looked into what appeared to be a girl's bedroom, he observed a male in the bed. (PH 45, 106, 128-129); (PH C. Ex. 8). This male was later identified as Co-Defendant Caleb Barnes. (PH 45-46). In addition, Sergeant Heffelfinger saw at least one (1) knife and a cell phone on the floor of this bedroom, and a cell phone on the headboard of the bed. (PH 47, 107, 128-129). Consequently, Sergeant Heffelfinger summoned uniformed officers to enter the room. (PH 48-49). He then noted a female in the bed, holding the sheets up to her chest. (PH 24, 40, 49-50, 107). This person

6

was later identified as Defendant Jamie Silvonek, the fourteen (14) year old daughter of David and Cheryl Silvonek. (PH 49-50). However, Cheryl Silvonek remained unaccounted for. (PH 24); (OPTM 12). At this time, approximately 8:15 A.M. to 8:30 A.M., Co-Defendant Barnes, Defendant Silvonek, and Mr. Silvonek were transported to South Whitehall Township for questioning by uniformed police officers. (PH 51, 54, 108-110, 114-115); (OPTM 11).

These three (3) people of interest were separated and put into different interview rooms. (PH 55); (OPTM 11-12). Each interview room was approximately fifteen (15') feet by fifteen (15') feet, with a table and several chairs. (OPTM 24, 27). In addition, each of the interrogation rooms had a window in it. (OPTM 24). Detective Heffelfinger spoke with Mr. Silvonek first at around 9:00 A.M. (PH 56); (OPTM 12-13). He inquired of Mr. Silvonek if there was an adult individual whom he could call in order to be present with Defendant Jamie Silvonek during the questioning, in light of the fact that she was fourteen (14) years old. (OPTM 13-15). Mr. Silvonek indicated that his mother-in-law, Margaret Lynn, should be contacted. (OPTM 13-15). Consequently, Ms. Lynn was contacted by Detective Heffelfinger. (OPTM 14-15). She was informed that Cheryl Silvonek was missing and that Mr. Silvonek and Defendant Jamie Silvonek were at the police station for questioning. (OPTM 15-16). Ms. Lynn agreed to come to the police station, but advised Detective Heffelfinger that it would take time to arrive, because she lived in Jim Thorpe. (OPTM 15-16).

As Detective Heffelfinger was concluding the interview with Mr.

7

Silvonek, Defendant Silvonek's grandmother arrived at the South Whitehall Township Police Department, and she agreed to sit in with Defendant Silvonek during the interview. (PH 56, 115, 117-118, 128); (Interview 2-3); (OPTM 17-18). The Officers allowed Defendant Silvonek time to speak with her grandmother in private for approximately fifteen (15) minutes prior to interviewing her. (PH 56-57, 115); (Interview 3-5); (OPTM 17-19). Prior to leaving Ms. Lynn alone with her granddaughter, Detective Heffelfinger provided them with a South Whitehall Township Police Department Warning of *Miranda* rights form to read and discuss. (OPTM C. Ex. 4); (OPTM 17-19).

It should be noted that it was determined that the authorities would interview Defendant Jamie Silvonek prior to Co-Defendant Caleb Barnes, because Mr. Silvonek did not have any idea who Co-Defendant Caleb Barnes was. (OPTM 16-17). Consequently, it was imperative to speak with Defendant Jamie Silvonek to learn the circumstances surrounding Co-Defendant Barnes's presence at the Silvonek residence and how he fit into the picture generally. (OPTM 16-17).

At the commencement of the recorded interview at approximately 11:30 A.M.,[7] the South Whitehall Township Police Department Warning of *Miranda* rights form was read to Defendant Silvonek and Ms. Lynn. (OPTM C. Ex. 4); (OPTM 19-20). Defendant Silvonek agreed to waive her *Miranda* rights, and both she and Ms. Lynn executed the form. (OPTM C. Ex. 4); (OPTM 19-21).

Detective Heffelfinger informed Defendant Silvonek that they were

---

[7] During this interview, Lieutenant Sorrentino, and Jeffrey Dimmig, Esquire, Senior Deputy District Attorney, were present.

8

investigating the disappearance of her mother, and that her mother's vehicle was found under suspicious circumstances. (PH 57). Defendant Jamie Silvonek indicated that around 6:00 P.M., the night before, her mother had driven her to a concert in Wilkes-Barre, Pennsylvania. (PH 57); (Interview 8-9). The mother waited in the car until the conclusion of the concert and drove her daughter back to the Lehigh Valley area. (PH 57). They drove to Chris's Diner, where the mother waited in the car while Defendant Jamie Silvonek ate breakfast. (PH 57); (Interview 10, 15). They arrived home at 1:00 A.M., and Defendant Silvonek got out of the car. (PH 57-58). Defendant Silvonek indicated that a conversation ensued involving her mother going out to buy spinach. (PH 58); (Interview 10, 15). According to Defendant Silvonek, she went upstairs to bed. (PH 58).

In addition, Defendant Jamie Silvonek explained to Detective Heffelfinger her relationship with Co-Defendant Caleb Barnes. (PH 58); (Interview 157-158). She indicated that she met him at a concert in Philadelphia in October of 2014. (PH 58); (Interview 22). Co-Defendant Barnes was supposed to meet her after the concert on March 15, 2015. (PH 58); (Interview 10-11, 22). After Defendant Jamie Silvonek had gone to bed, she was awakened by Co-Defendant Barnes shaking her and inquiring of her what store is open 24 hours a day. (PH 58); (Interview 11, 25, 36). To this, Defendant Silvonek responded, "Walmart." (PH 58-59); (Interview 11, 36). Thereafter, she indicated that Co-Defendant Barnes took her from the house and drove wildly to Walmart in Trexlertown, Pennsylvania. (PH 59); (Interview 11-12, 25, 36). In the store, Co-Defendant

9

A-10

Caleb Barnes was rushing around buying rubbing alcohol, a flashlight, a file and other items. (PH 59); (Interview 12-13). Upon their return to the residence, Defendant Jamie Silvonek returned to bed, while Co-Defendant Caleb Barnes disappeared for a while. (PH 59); (Interview 13). When he returned, he woke her up again, held her down and had non-consensual sex with her. (PH 60, 129); (Interview 12-14). Defendant Jamie Silvonek told the officers that Co-Defendant Caleb Barnes told her that he "slit her throat and then buried" her mother. (Interview 32-33, 38-39, 144); (OPTM 22).

At the part of the interview in which Defendant Silvonek stated that Co-Defendant Barnes had slit her mother's throat, the elderly Ms. Lynn became hysterical and had to be removed from the interview room. (OPTM 22-23). Ms. Lynn remained in the South Whitehall Township Police Department. (OPTM 23). It was inquired of Defendant Silvonek if she wanted to continue with the interview in the absence of her grandmother, and she agreed to continue speaking with the authorities. (OPTM 23). Defendant Silvonek was told that she could take a break and speak with her grandmother at any time, but she never exercised this option.[8] (OPTM 68).

---

[8] This Court notes that Defendant Silvonek is in the "very superior range of intelligence" and had a gifted individualized education plan through the Parkland School District beginning in 2011. (OPTM C. Ex. 5); (OPTM C. Ex. 6); (D Ex. 2). Pursuant to testing performed by Dr. Dattilio, Defendant Silvonek has a verbal comprehensive index of 142, and a full scale IQ of 129. (OPTM C. Ex. 5); (D. Ex. 2). According to the Parkland School District records of 2010, Defendant Silvonek obtained a verbal IQ of 153 and as performance IQ of 120, yielding a full scale IQ of 142. (OPTM C. Ex. 5); (OPTM C. Ex. 6); (D. Ex. 2).

A-11

Throughout the interview process, Defendant Jamie Silvonek's story evolved. (PH 61, 110). After approximately one (1) hour into the interview, Defendant Jamie Silvonek related a different story to the authorities. (PH 62); (Interview 40). This version entailed that Co-Defendant Caleb Barnes came to the house prior to the concert and that her mother had agreed to take them both to the concert. (PH 62); (Interview 52-54). They arrived early to the concert and her mother left them alone in the vehicle where they had consensual sex. (PH 62-63); (Interview 122-125, 156, 166). When her mother returned to the vehicle, she caught them in the vehicle with Defendant Silvonek's pants off. (PH 63, 117); (Interview 124-125, 166). Her mother did not say anything to them at that time. (PH 63); (Interview 125). Shortly thereafter, Co-Defendant Barnes and Defendant Silvonek went to the concert. (PH 63, 117); (Interview 125-126). After the concert, Defendant Jamie Silvonek's mother drove them back to the Lehigh Valley area where Defendant Silvonek and Co-Defendant Barnes had breakfast together at Chris's Diner located on Tilghman Street in Kuhnsville, Upper Macungie, Lehigh County. (PH 64, 117); (Interview 41, 129-130). Defendant Jamie Silvonek's mother waited in the car. (PH 64-65); (Interview 42, 129-130). After breakfast, Defendant Jamie Silvonek's mother drove them home. (PH 65); (Interview 55, 132-133).

Defendant Silvonek further related that Co-Defendant Barnes was seated in the rear of the vehicle behind the driver's side and Defendant Silvonek was seated behind the front passenger seat. (PH 65); (Interview 55-56).

11

Defendant Jamie Silvonek indicated that once they were in the driveway of her residence, Co-Defendant Caleb Barnes reached around the front seat and grabbed her mother by the throat and began choking her. (PH 65-66); (Interview 56-57, 135-136, 139-140). Mrs. Silvonek was begging for her life and was pleading for her daughter to help her. (PH 65-66); (Interview 57, 141). At one part, Mrs. Silvonek used her foot to sound the car horn. (PH 66); (Interview 140-141). Co-Defendant Barnes struck Mrs. Silvonek in the face multiple times during the struggle and ultimately pulled out a knife and stabbed Mrs. Silvonek. (PH 66-69, 110-111); (Interview 59, 61, 142-145). Defendant Silvonek related that Co-Defendant Barnes did this because he did not want Cheryl Silvonek standing between him and Defendant Silvonek being together. (PH 111); (Interview 30-31, 149).

At this point, Defendant Jamie Silvonek continued to put the blame entirely on Co-Defendant Caleb Barnes: She related that he moved Mrs. Silvonek to the passenger seat; drove the vehicle to the traffic circle area of the development; drove to Walmart in his vehicle, where he purchased disinfectant wipes, rubbing alcohol, a file, a box cutter, a flashlight, and leather gloves; drove back to the Silvonek residence; got into Mrs. Silvonek's vehicle and drove it Haasadahl Road; removed Mrs. Silvonek's body from the vehicle; dragged her into the woods; and buried her body by the pond. (PH 69-70); (Interview 60-88). While he was burying the body, they noticed a man with a flashlight and they hid. (PH 70); (Interview 41). After the man left, they returned to the Silvonek residence.

12

A-13

(PH 70); (Interview 41). Then, they took the vehicle to the area of Applewood Drive and Huckleberry Road, and Co-Defendant Caleb Barnes disposed of the vehicle in the pond. (PH 71); (Interview 95). They then returned to the Silvonek residence and washed their clothes and got into bed together. (PH 71). Defendant Jamie Silvonek claimed that they then had non-consensual intercourse. (PH 71); (Interview 97-98, 156, 166-167, 173).

Defendant Jamie Silvonek explained that her mother had found out that Co-Defendant Caleb Barnes was twenty (20) years old and a soldier at Fort Meade. (PH 72, 122). Mrs. Silvonek had shown Co-Defendant Barnes her daughter's passport to prove to him that her daughter was only fourteen (14) years old. (PH 72, 122, 125).

During the interview, Detective Heffelfinger noted that Defendant Jamie Silvonek had a scratch on her neck, dirt under her fingernails, mud in the webbing of her thumb, scratches on her knuckles, a scratch on her wrist, and a broken acrylic fingernail. (PH 60); (Interview 17-18, 20-21, 29, 133-135). The interview lasted approximately one and a half (1 ½) hours. (PH 116).

In addition, Defendant Jamie Silvonek provided the Officers with verbal consent to search her cell phone and even furnished them with the pass code and service provider. (PH 73, 79, 81-83); (PH C. Ex. 12); (Interview 7, 111). Ultimately, a search warrant was obtained for this cell phone. (PH 81).

During the interview, Defendant Jamie Silvonek was not handcuffed or tethered. (OPTM 24). She had access to the bathroom facilities and

13

A-14

was offered water several times. (OPTM 24). In fact, she did eat and had something to drink. This interview was conducted in essentially two (2) parts. (OPTM 24-25). The first part lasted for approximately one and half (1 ½) hours (from 11:30 A.M. until 1:00 P.M.) and second part occurred at approximately 5:30 P.M. for about one (1) hour.[9] (OPTM 25, 34-36). To further the investigation, during this break between the two (2) phases of the interview, Detective Heffelfinger spoke with Co-Defendant Caleb Barnes, as well as Witness Number One with regard to telephone conversations that Defendant Silvonek alleged occurred among her, Witness Number One, and Co-Defendant Barnes. (OPTM 25-27).

At no time during the interview process was Detective Heffelfinger loud or yelling at Defendant Silvonek. (OPTM 33-36). Indeed, his demeanor was calm and cordial throughout the interview process. (OPTM 33-36). Detective Heffelfinger was dressed in a sports coat, sweater, and blue jeans. (OPTM 33-34). He was not displaying a gun holster, nor did he issue any threats to her. (OPTM 24, 33-34).

After the interview with Defendant Jamie Silvonek concluded, Detective Heffelfinger and Detective Adam Miller of the Upper Macungie Police

---

[9]     Defendant Silvonek was the individual to initiate this second phase of the interview, as she was the one who asked to speak with the police again. (OPTM 34). At the commencement of this second part of the interview, Defendant Silvonek's *Miranda* rights were again discussed. (OPTM 34-35). She was told that he could have an adult present and that she could stop speaking at any time. (OPTM 34-35). She indicated that she understood her rights and wanted to continue speaking with the authorities. (OPTM 34-35).

14

A + 15

Department interviewed Co-Defendant Caleb Barnes. (PH 72, 74); (OPTM 27). This interview commenced at approximately 2:30 P.M. (OPTM 40, 43). Co-Defendant Barnes was dressed in black basketball shorts and an emergency blanket provided to him by the authorities, as he was not wearing a shirt at the time that he was encountered at the Silvonek residence.[10] (OPTM 28-29). The interview room was heated and was a comfortable temperature. (OPTM 46, 50).

At the commencement of the interview, Co-Defendant Caleb Barnes was provided with *Miranda* warnings. (OPTM C. Ex. 7); (PH 73-74); (Defendant Interview 3-4); (OPTM 29-30). In particular, the South Whitehall Township Police Department Warning of *Miranda* rights form was read to Co-Defendant Barnes by Detective Heffelfinger. (OPTM C. Ex. 7). Co-Defendant Barnes waived his *Miranda* rights by signing the form, and agreed to speak with the authorities. (OPTM C. Ex. 7); (PH 73); (Defendant Interview 4); (OPTM 29-31). Co-Defendant Barnes spoke English, and seemed oriented to time and space. (OPTM 30). He appeared to understand all of the questions, although he was angry. (OPTM 30, 32).

Detective Heffelfinger indicated to Co-Defendant Caleb Barnes that they wanted to speak with him "about last night." (OPTM 44). Initially Co-Defendant Caleb Barnes indicated that he had just left Alexandria, Virginia and drove through the night to arrive at the Silvonek residence shortly before the

---

[10]  Prior to being transported to the South Whitehall Police Department, Detective Heffelfinger offered to go out to the Co-Defendant's car and retrieve a shirt for him, but Defendant Barnes declined this offer.

15

A-11.

Officers' arrival. (PH 73); (Co-Defendant Interview 4-6). He denied that he went to a concert with Defendant Silvonek and indicated that he had no idea what the authorities were talking about. (PH 75); (Co-Defendant Interview 6-7). After Detective Heffelfinger told Co-Defendant Barnes that they had spoken with Defendant Silvonek who provided a totally different version of events, Co-Defendant Barnes's demeanor immediately changed. (PH 75); (Co-Defendant Interview 10-11).

Co-Defendant Barnes then told an entirely different story. (PH 76). He indicated that he had no idea that Defendant Silvonek was only fourteen (14) years old. (Co-Defendant Interview 13-15). Co-Defendant Barnes also admitted that Mrs. Silvonek did drive them to and from the Breaking Benjamin concert. (PH 76, 121); (Co-Defendant Interview 15, 27). He stated that when they pulled into the driveway of the Silvonek residence, Mrs. Silvonek exited the vehicle. (PH 76); (Co-Defendant Interview 28). When she returned, she found them engaging in sexual intercourse and became extremely angry. (PH 76, 119); (Co-Defendant Interview 15, 19-20, 29-30). She opened the door and tried to hit her daughter. (PH 76, 119); (Co-Defendant Interview 15-16, 20-21, 23, 30). Co-Defendant Barnes then tried to protect Defendant Silvonek. (PH 76, 112); (Co-Defendant Interview 15-16, 20-21, 23, 30). At this point, Mrs. Silvonek directed her anger at him. (PH 76, 119-120); (Co-Defendant Interview 15-16, 22). A physical altercation ensued and he admitted that he stabbed Mrs. Silvonek several times in the throat with a half serrated pocket knife (PH 76-77); (Co-Defendant Interview

16

A-17

17, 21-23, 31-32). Co-Defendant Barnes indicated that they went to Walmart in his vehicle, and ultimately buried the body and drove the victim's vehicle into the pond. (PH 77); (Co-Defendant Interview 24-26, 33-34, 37, 40). Co-Defendant Caleb Barnes stated that Defendant Silvonek really had nothing to do with the events of that evening, and he "threw himself on the sword." (PH 77, 113, 120); (Co-Defendant Interview 26, 40, 43-44, 69-71). Co-Defendant Barnes indicated that "I killed her [Defendant Silvonek's] mother, for absolutely no reason." (Co-Defendant Interview 11).

Co-Defendant Caleb Barnes provided the authorities with consent to search the phone, as well as the pass code and service provider. (PH 79, 81); (PH C. Ex. 11); (Co-Defendant Interview 58, 75, 77, 80). Co-Defendant Caleb Barnes's cell phone was located in Defendant Silvonek's bedroom. (PH 79); (PH C. Ex. 11). Ultimately, a search warrant was obtained for this cell phone. (PH 81, 90-101); (PH C. Ex. 15). Text messages between Co-Defendant Barnes and Defendant Silvonek were recovered. (PH 91-101); (PH C. Ex. 15); (PH C. Ex. 16).

During the interview, Detective Heffelfinger noted that Co-Defendant Caleb Barnes had a large scratch on his right forearm, and scratches on his chin and around his face. (PH 74, 111-112); (Co-Defendant Interview 8-9).

At no time during the interview process was Detective Heffelfinger loud or yelling at Co-Defendant Barnes. (OPTM 33-34, 44-45). Indeed, Detective Heffelfinger's demeanor was calm and cordial to him. (OPTM 33-34, 44-45). Detective Heffelfinger was dressed in a sports coat, sweater, and blue jeans.

17

A-18

(OPTM 33-34). He was not displaying a gun holster, nor did he issue any threats to him. (OPTM 33-34). Co-Defendant Barnes had access to food, water and the bathroom facilities. (OPTM 27-28, 31).

Co-Defendant Caleb Barnes asked to use the restroom facilities at 2:45 P.M., and this request was honored at 3:40 P.M. (OPTM 46-47). He was also brought food at this time. The delay in allowing Co-Defendant Caleb Barnes to use the restroom was caused by the Pennsylvania State Police's desire to perform a search of Co-Defendant Barnes's person prior to his washing his hands. (OPTM 46-47). Furthermore, Co-Defendant Caleb Barnes was provided with additional items to wear, which included scrubs, at approximately 5:00 P.M. (OPTM 50-51).

As part of the processing of the residence, a heavily blood-stained knife was located on a picnic table to the rear of the home. (PH 52-54, 108); (PH C. Ex. 9); (PH C. Ex. 10).

Barbara Bollinger, M.D., a forensic pathologist at Forensic Pathologies Associates, and deemed by this Court to be an expert in the field of forensic pathology, performed an autopsy on the victim, Cheryl Silvonek, on March 16, 2015, at 10:00 A.M. (PH 85); (PH C. Ex. 13); (PH C. Ex. 14); (C. Ex. 11); (C. Ex. 12); (C. Ex. 13); (C. Ex. 14); (C. Ex. 15); (C. Ex. 16); (C. Ex. 17); (C. Ex. 18); (C. Ex. 19); (C. Ex. 20); (C. Ex. 21). The cause of death was sharp force injuries[11] to the neck. (PH 85); (PH C. Ex. 13); (C. Ex. 11). Specifically, the victim suffered

---

[11]    According to Dr. Bollinger, "sharp force injuries" are injuries that are created by the use of a sharp instrument or implement like a knife or a shard of glass, and it creates a cutting wound with sharp edges.

A-19

more than five (5) incised wounds to the head, neck and right clavicle region, as well as perforations of the strap muscles of the neck, right carotid artery, and internal jugular vein, and penetration of the trachea. (C. Ex. 11); (C. Ex. 18). Petechiae of the eyes were noted, along with a fracture of the hyoid bone, which evidenced that pressure had been applied to the neck and suggests strangulation. (C. Ex. 11). In addition, the victim had sub-scapular hemorrhaging and bruising. (C. Ex. 15); (C. Ex. 16); (C. Ex. 17). Dr. Bollinger opined that the superficial wounds and bruising on the victim's hands, thumb and wrist were consistent with defensive wounds. (C. Ex. 19); (C. Ex. 20); (C. Ex. 21). The manner of death was determined to be homicide. (PH 86); (PH C. Ex. 13); (C. Ex. 11).

A search warrant was obtained and executed for the data from the EZ transponder associated with the subject vehicle driven by Mrs. Silvonek. (PH 87); (PH C. Ex. 25). From these records, it was determined that the vehicle entered the Lehigh Valley entrance to the northeast extension at 5:56 PM and exited the Wyoming Valley exit at 6:41 PM on March 14, 2015. (PH 87-89); (PH C. Ex. 25). Thereafter, the vehicle re-entered the Wyoming Valley exit at 11:03 PM at exited the Lehigh Valley exit at 11:58 PM on March 14, 2015. (PH 89); (PH C. Ex. 25).

Witness Number One, an eighth grade girl, testified at the Preliminary Hearing that she was friends with Defendant Jamie Silvonek. (PH 130-131). She was aware of Co-Defendant Caleb Barnes's relationship with Defendant Silvonek, and that it had been going on for approximately six (6)

19

months. (PH 132, 151). This witness also knew that Co-Defendant Caleb Barnes was stationed at Fort Meade in Maryland, and that he was twenty (20) years old. (PH 132-133). Apparently, Defendant Silvonek had indicated that Co-Defendant Barnes believed her to be sixteen (16) or seventeen (17) years old, because she had lied to him about her age. (PH 133-134, 151).

Defendant Jamie Silvonek told this witness that the week before, on Friday, March 6, 2015, Co-Defendant Barnes had gone to Defendant Silvonek's house and they spent the night together and had consensual sex in the basement of the Silvonek residence. (PH 135-137, 141-142). When Cheryl Silvonek found the two of them together in the basement, she kicked Co-Defendant Caleb Barnes out of her house when she learned of his age. (PH 136-138). Cheryl Silvonek forbade them from seeing each other again. (PH 138). Sometime after this incident on Saturday, March 7, 2015, Witness Number One visited Defendant Silvonek at her residence. (PH 138-139, 154). Unexpectedly, Defendant Silvonek brought up killing her parents to Witness Number One. (PH 139-140, 154-155). She had mentioned, "What if my parents were killed?" (PH 140). At that time, Defendant Silvonek placed a telephone call to Co-Defendant Caleb Barnes, and put the telephone on speakerphone so that Witness Number One could hear the conversation. (PH 140-147). While on the telephone with Co-Defendant Barnes, Defendant Silvonek stated, "I miss having sex with you." (PH 145). In addition, during the telephone conversation, multiple times Defendant Silvonek brought up to Co-Defendant Barnes the idea of killing her parents, because her mother did

20

not approve of their being together. (PH 145-147, 155, 159); (Interview 172). During a second telephone conversation, also on speakerphone, a discussion ensued between Co-Defendant Barnes and Defendant Silvonek with regard to killing her parents. (PH 147-148, 160). Co-Defendant Caleb Barnes indicated that he "already had the knives picked out." (PH 148, 157, 160). Defendant Silvonek stated that they could live off of the life insurance money from her father. (PH 148-149, 160). The next day, via a text message, Defendant Silvonek told Witness Number One that the entire thing was a joke. (PH 149-150, 156, 161). Later in the week, at school, Defendant Silvonek reiterated to Witness Number One that it was a joke. (PH 150-151, 154, 156).

Ms. Michelle Mueller resides at 1522 Randi Lane, Orefield, Lehigh County, Pennsylvania, is the next door neighbor to the Silvonek family. (PH 168-172); (PH C. Ex. 17); (PH C. Ex. 18); (PH C. Ex. 19). Her bedroom window overlooks the Silvonek's driveway. (PH 174); (PH C. Ex. 19). On the evening of Saturday, March 15, 2015, Ms. Mueller was at St. Joseph the Worker Church. (PH 172). She returned home to her residence at approximately 9:45 P.M. (PH 172). She went up to bed at about 11:00 PM to watch television. (PH 175-176). Ms. Mueller fell asleep, and was awakened at approximately 1:00 A.M. by the short, random beeping of a car horn. (PH 175-182, 189-190). This random beeping occurred again at approximately 1:06 A.M. (PH 175-182, 190). Ms. Mueller then proceeded to look outside of her bedroom window. (PH 179); (PH C. Ex. 19). She observed a car in the Silvonek's driveway with the headlights

21

A - 22

illuminated. (PH 179-180). Shortly thereafter, Ms. Mueller heard some commotion and clanking in the Silvonek's garage. (PH 182-183). This prompted Ms. Mueller to again look outside the bedroom window. (PH 183-184, 191-192); (PH C. Ex. 19). Ms. Mueller noted that the front driver side door of the vehicle in the driveway was open and the interior light of the car was illuminated. (PH 183-184). In addition, now a middle garage bay door was open, and there was an additional vehicle in the driveway that was not there previously. (PH 184-185, 191-192). Ms. Mueller noted that Defendant Jamie Silvonek, dressed in a gray sweatshirt and black yoga pants, was casually walking into the garage. (PH 185-186, 195-196).

Detective Louis Tallarico of the Lehigh County District Attorney's Office, assigned to the Lehigh County Homicide Task Force, was tasked with investigating the within homicide. (PH 199-200). After learning that the victim, Cheryl Silvonek, had driven Co-Defendant Caleb Barnes and Defendant Silvonek to a concert held at the Scranton Hilton on March 14, 2015, and had parked in the adjacent parking deck by said hotel, he traveled to this garage to obtain the surveillance video. (PH 200-201); (PH C. Ex. 21). Detective Tallarico visited the Central Parking Garage and spoke with Kyle Cecci, the assistant manager for that garage. (PH 201). Detective Tallarico reviewed video surveillance from the Central Parking Garage, and was able to identify the victim's vehicle entering the parking deck. (PH 201-202); (PH C. Ex. 20). Specifically, Cheryl Silvonek's vehicle was viewed entering the garage at 6:59 P.M. (PH 202); (PH C. Ex. 20). In addition,

22

A-23

Detective Tallarico observed Cheryl Silvonek numerous times on the video recording. (PH 203). Defendant Silvonek was also observed on the parking deck video utilizing her cell phone. (PH 203). Moreover, Detective Tallarico obtained video footage from the concert venue of Co-Defendant Barnes and Defendant Silvonek within the lobby of the Scranton Hilton. (PH 203-204).

As part of the investigation, Detective Tallarico also seized the video from Chris's Diner on Tilghman Street in Upper Macungie Township, Lehigh County. (PH 204); (PH C. Ex. 23). In this video, Detective Tallarico observed both Co-Defendant Barnes and Defendant Silvonek in this restaurant for approximately forty-five (45) minutes, commencing at approximately 12:02 A.M. and ending at approximately 12:47 A.M., on March 15, 2015. (PH 205-207); (PH C. Ex. 23).

Detective Tallarico also travelled to and obtained the video footage from the Walmart located on Millcreek Road, Trexlertown, Lehigh County, Pennsylvania. (PH 208-209); (PH C. Ex. 24). He spoke with Kelli Hanitz, the loss prevention officer, to arrange to view the video. (PH 208-209); (PH C. Ex. 24). The relevant video commenced at 2:08 A.M. (PH 211); (PH C. Ex. 24). While at Walmart, at approximately 2:30 A.M., a box of Clorox wipes, two bottles of rubbing alcohol, a pair of gloves, a gallon of bleach, a flashlight, an eight inch metal file and a razor knife were purchased. (PH 211); (PH C. Ex. 24); (PH C. Ex. 26). On this video, Defendant Jamie Silvonek appears to have directed Co-Defendant Caleb Barnes to go in a specific direction, and to have caringly fixed the

23

hood on his jacket. (PH C. Ex. 24).

Defendant Silvonek was born on February 24, 2001. She was fourteen (14) years old at the time of this incident. Prior to being arrested in the within matter, the Defendant had no involvement with the juvenile criminal system.

This Court notes that the impact on the victim was devastating, and resulted in the horrific death of the Defendant's own mother, a vibrant fifty-four (54) year old woman. The horrifying physical struggle occurred over the duration of twenty (20) minutes and amounted to torture. She was beaten, strangled, and ultimately stabbed to death. During the course of this heinous crime, the victim begged her beloved daughter for her life. It is unimaginable what the victim had to endure during the last twenty (20) minutes of her life.

Also, the community was impacted by this vicious and monstrous crime. As Deborah Belles, a co-worker of the victim at the Center for Women's Medicine testified, the victim's absence is still greatly mourned by the community. Ms. Belles related to this Court that the victim touched many people's lives and the loss is felt throughout the community. The victim was described as "irreplaceable." It is undisputed that the loss of the victim affected the Orefield Middle School community, the Parkland School District community, the medical community, and the general Lehigh Valley community. Furthermore, the area in which the homicide occurred is residential in character. Consequently, the Defendant's actions posed a grave risk to the community at large. It is undeniable

24

A-25

that the victim, the victim's family, and the victim's neighborhood have been negatively affected by this terrible crime. This type of criminal activity causes others in the community to feel that their safe environment has been breached and violated.

Without a doubt, the nature and circumstances of the within alleged offense are extremely serious. Defendant was not simply in the wrong place at the wrong time, but rather was a willing and active participant in the murder of her mother. The Defendant was integral to the success of the criminal plan, as she was the genesis of the idea and provided the opportunity.[12] The Defendant participated in the planning and plotting of the homicide, prodded the Co-Defendant to effectuate the homicide, and willingly participated in the clean-up of the scene of the crime in the aftermath of the brutal killing of her mother. Although she did not physically wield the knife that threaded the victim's neck muscles, the Defendant was an effective and active contributor to the homicide. Indeed, the Defendant was completely culpable in this crime.

The nature of the crime itself and the Defendant's role in the crime demonstrated criminal sophistication. This was not a spur of the moment crime without clearly defined roles and parts. The Defendant's intelligence and manipulation were essential to achieving the desired goal – murder. No factors weigh so heavily to this Court as do the sophistication of the crimes committed

---

[12] But for the Defendant, Co-Defendant Caleb Barnes never would have killed the victim.

25

A-26

and the Defendant's degree of culpability in the commission thereof. See Commonwealth v. Pennington, 751 A.2d 212, 219 (Pa. Super. 2000).

The Defendant is a threat to the safety of the public or any individual, as she takes no responsibility for her actions. Without accepting responsibility and recognizing the problems, the likelihood that rehabilitation will be successful is greatly diminished. Moreover, the Defendant participated in the premeditated killing of her own mother, who deeply loved her and cared for her in every way possible. It is conceivable that a person who is capable of killing her own mother potentially could kill anyone.

Frank M. Dattilio, Ph.D., an expert in the field of forensic psychology and the decertification of juveniles in Pennsylvania, evaluated the Defendant for purposes of the within decertification matter. (D. Ex. 1); (D. Ex. 2); (OPTM C. Ex. 5). Dr. Dattilio interviewed the Defendant on multiple occasions, as well as performed a battery of diagnostic assessments on her. In addition, he performed collateral interviews and a review of various material relating to the within matter. Dr. Dattilio found the Defendant to be an extremely intelligent individual:

> She obtained a verbal comprehensive index of 142, placing her in the very superior range of intelligence. In slight contrast, she produced a perceptual reasoning index of 115 (high average range), a working memory index of 100 (high average range) and a processing speed of index of 118 (high average range). Her full scale IQ score is 129, which places her at the top end of the superior range, right on the crest of the very superior range.

A-27

(D. Ex. 2, p. 18). Dr. Dattilio opined that there was "no significant variance with her subscale scatter that would indicate any learning disabilities or cognitive impediments." (D. Ex. 2, p. 18). Dr. Dattilio did indicate that the differential shows that the Defendant lags in emotional maturity and decision-making in non-cognitive matters. He did acknowledge that the Defendant did have some anger problems and that she was "bratty and mouthy with her parents."

Dr. Dattilio opined that the Defendant should be decertified as she is amenable to treatment and supervision in a juvenile facility. This Court notes that the primary foundation on which Dr. Dattilio's report is based is the Defendant's own unreliable recounting and version of events. Indeed, this Court recognizes that the Defendant has presented many different versions of the events, as they are constantly changing.[13] Of prime importance, Dr. Dattilio based his opinion on the fact that the Defendant did *not* execute the killing of her mother, was surprised by the killing, and was an *unwilling* participant in it. However, the Defendant's text messages between the Defendant and the Co-Defendant, the Walmart video (not reviewed by Dr. Dattilio), the Lehigh County Jail letter[14] (not reviewed by Dr. Dattilio prior to preparing his report), as well as

---

[13] For example, the Defendant initially reported to Dr. Dattilio that the Co-Defendant, Caleb Barnes, had lied to her about his age and told her that he was only sixteen (16) years old. Later, however, the Defendant admitted that the Co-Defendant had advised her that he was twenty (20) years old. (C. Ex. 10); (D. Ex. 4). In reality, it was the Defendant who had lied to the Co-Defendant about her age. (D. Ex. 4).

[14] Lehigh County Jail Corrections Officer, Emily Cramer, has dealt with the Defendant for over six (6) months, as she is assigned to the Defendant's pod in Lehigh County Jail. During the Defendant's incarceration at Lehigh County Jail, Corrections Officer Cramer indicated that special provisions have been made for her in light of her young age. She found the Defendant to be well-adjusted and happy. She participates in activities with the

27

her telephone conversation with the Co-Defendant in the presence of Witness Number One as recounted in the Preliminary Hearing testimony, undermine this assertion. (C. Ex. 8); (C. Ex. 9); (OPTM C. Ex. 1); (PH C. Ex. 16); (PH C. Ex. 24); (C. Ex. 22). Based on the Defendant's self-reporting, Dr. Dattilio found the Defendant to be emotionally immature, unsophisticated, not savvy, and vulnerable. However, this is in direct contrast to the picture that she painted to others.

Diane Haberstroh, a seventh grade science teacher at Orefield Middle School in the Parkland School District, was the Defendant's advisor on a Science Fair Project during the 2014-2015 academic school year. She testified that the Defendant was specifically chosen to participate in this project as a result of her good social skills. The Defendant handled herself well with adults, and often used flattery to manipulate the conversation. Ms. Haberstroh described the

---

other female inmates. To date, the Defendant has incurred three (3) misconducts. Specifically, (1) she passed cookies and tea to a disciplinary inmate; (2) she tried to pass a note to a male inmate on another pod; and (3) on or about September 14, 2015, she approached a female inmate and handed her a note, requesting that she rewrite the note in her own handwriting and send it to her father with instructions for him to send it to the intended inmate recipient, Co-Defendant Caleb Barnes. (C. Ex. 22). After the female inmate received the note from the Defendant, she furnished it to Corrections Officer Cramer. (C. Ex. 22). In the note, the Defendant reaffirms her love for her Co-Defendant and asks for his help with the decertification hearing:

> "My decertification hearing is coming up soon, and I need your help. I ask this of you as the only hope of us ever being together is if I get sent back to Juvenile Court. After 7 years, I can move to wherever you are, and we can be together. If our positions were reversed, and you were the one trying to be decertified, I would be on the stand at that hearing, taking the fall for you."

(C. Ex. 22).

28

A-29

Defendant as a "chameleon" who would change according to whom she was speaking and interacting, so as to appear interested. Ms. Haberstroh felt that the Defendant was very good at reading people and utilizing social cues. In addition, the Defendant texted the Co-Defendant on January 25, 2015 in which she texted the following:

> You are the complete opposite, Caleb. I know you feel that your need to control yourself suggests there is something wrong with you, but that is not your case. I'm fucked up as well, even more so than you are. My mind is more fucked up than you could ever know. You are you, Caleb. You are different. You possess character traits that most people don't. But that's what makes you so appealing. You have a different purpose than most people. Your personality is like mine in the sense it is too much for some people to handle. For me, people can't handle me. I'm always too much, too smart, too kind, too strong willed, too opinionated, too determined, too ambitious. It drives people away. Therefore, I used to sharpen my edges and smooth the rough parts of myself that were too much for others in hopes of being more loveable. But in the process of doing so, I realized I was ridding myself of the things that made me who I am. Don't change, Caleb. Don't be afraid of the sides of you that are dark or terrifying. *I know you feel obligated to hide them, but I don't want you to do that with me. I get it. I have dark sides as well, people underestimate how cold, iniquitous, meticulous and calculating I can be. I hide parts of me so well, no one suspects it.* The people that try to break down my walls always fail. I love every part of you that could ever exist, Caleb. I don't care what you feel you're capable of.

(C. Ex. 8) (Emphasis supplied). During the decertification hearing on October 29, 2015, Dr. Dattilio openly acknowledged to this Court that "she lies," and he is constrained to base his report on the Defendant's version of events. However, this

29

A-30

Court is not constrained to accept them. As this Court finds that the foundation is faulty on which Dr. Dattilio based his report and opinion therein, this Court must reject Dr. Dattilio's opinion despite highly regarding and respecting him as a clinical and forensic psychologist.[15]

Steven Berkowitz, M.D., an expert in adolescent psychiatry and mental health, performed a clinical interview of the Defendant at the Lehigh County Jail. In addition, he reviewed the battery of diagnostic assessments performed on the Defendant by Dr. Dattilio, as well as reviewed various materials relating to the within matter. (D. Ex. 3); (D. Ex. 4). However, this Court notes that prior to authoring his report, Dr. Berkowitz did not interview any of the Defendant's teachers. (D. Ex. 4). Nor did he review the Defendant's school records, the Walmart video, the voluminous text messages between the Defendant and the Co-Defendant, the psychiatric reports of Dr. John F. Campion, M.D., the sexual assault report of Dr. Debra Jenssen, M.D., or social media internet sites used by the Defendant (C. Ex. 8); (C. Ex 25); (C. Ex. 10); (PH C. Ex. 24); (OPTM C. Ex. 7); (D. Ex. 4). Dr. Berkowitz cited to Adolescent Brain Development as a reason that adolescents exhibit poor judgment, impulsivity, and poor ability to read others' social cues emotions. (D. Ex. 4). Dr. Berkowitz commented that the Supreme Court decisions have confirmed that teens and adults should not be held to the same legal standard due to the undeveloped adolescent brain. In fact,

---

[15] Dr. Dattilio testified that if the Defendant did plot, egg on, and participate in the planned murder of her mother, it would *not* be in the public interest to decertify the Defendant.

A - 31

Dr. Berkowitz admitted that his own personal belief and opinion that no teenager should be held to the same legal standard as an adult factored into his professional opinion in the within matter. Based on this reasoning, it logically flows that all adolescents should be decertified and not prosecuted in adult court. This is not a tenable solution. Moreover, this Court finds that an expert cannot render an opinion as to a phase of life or a phase of development without tying it into the facts and circumstances of the within matter. In addition, contrary to Dr. Dattilio's conclusions within his report, Dr. Berkowitz opined that the Defendant has a non-verbal learning disability. In other words, the Defendant has difficulty with social interactions involving non-verbal communication. However, the record belies this to be the case, given, *inter alia*, her texts and her teacher's impressions. Regardless, this Court notes that non-verbal learning disability is not a recognized disorder pursuant to the DSM-V. Based on the deficiencies addressed above, this Court cannot accept Dr. Berkowitz's opinion and recommendation to decertify the Defendant, as this Court finds them to be flawed.

John S. O'Brien, M.D., J.D., an expert in forensic psychiatry, opined that the community would be best served by maintaining the Defendant's adult status. (C. Ex. 23); (C. Ex. 26). Dr. O'Brien drew this professional conclusion after interviewing the Defendant and performing a thorough review of the records. (C. Ex. 23). He found that the Defendant "seamlessly adjust[ed]" her story and provided multiple versions of what took place on the evening of March 14, 2015 and early morning hours of March 15, 2015." (C. Ex. 23). In the Defendant's

31

version, she "minimize[d] her problems and overlook[ed] personal fault," by "continuing to distance herself from any responsibility for the offense." (C. Ex. 23). The Defendant was found to be "a good liar and had successfully lied on multiple occasions in order to get what she wanted."[16] (C. Ex. 23). She was seen by others in the community as being "socially savvy," "a psychological bully" and a "manipulator." (C. Ex. 23). Overall, the Defendant presented herself differently to different people in order to achieve her end goal. (C. Ex. 23). Indeed, during the course of her therapy with Dr. John Campion, the Defendant ironically was seen as having "a significant improvement in her symptoms" at a time when "her actual performance and participation in school activities deteriorated" and her relationship with her parents was contentious. (C. Ex. 23).

Dr. O'Brien found the Defendant to be "a highly intelligent and manipulative young woman" who was not a "fearful or emotionally overpowered passive participant in the pre-planned, premeditated murder of her mother." (C. Ex. 23). Dr. O'Brien concluded that the Defendant was "an individual who could size up her audience and behave in a manner that was consistent with their interests and their receptiveness to her self-serving and ingratiating representation of herself."[17] (C. Ex. 23). Therefore, Dr. O'Brien opined that "it

---

[16]     Dr. Dattilio, Dr. Berkowitz, and Dr. O'Brien all opine as to the Defendant's adeptness at lying. (C. Ex. 23).
[17]     At the evidentiary hearing conducted on October 29, 2015, Dr. O'Brien testified that he found the Defendant *not* to be deficient in her ability to perceive non-verbal cues. Au contraire, Dr. O'Brien opined that the Defendant was adept at reading situations and people. In addition, Dr. O'Brien indicated that the Defendant uses her display of emotions to benefit herself and therefore she cries when she believes it to be

32

A-33

would be impossible to gauge the degree to which [the Defendant] was benefitting from treatment or rehabilitation or reasonably or accurately assess the progress which she would not doubt profess to be making." (C. Ex. 23). Consequently, Dr. O'Brien opined that decertification to juvenile court is not appropriate in this situation.[18] We agree and accept Dr. O'Brien's opinion and conclusions.

In addition, Lehigh County Juvenile Probation Officer, Lisa Costello, discussed the different placement options in Pennsylvania for a fourteen (14) year old female who faces the charge of criminal homicide. Officer Costello did not opine as to the appropriateness of any juvenile placement facility for this specific Defendant. Generally, she indicated that there are two (2) options available in Pennsylvania: North Central Secure Treatment Unit in Danville, Pennsylvania and Adelphoi Village in Latrobe, Pennsylvania.

Officer Costello indicated that the North Central Secure Treatment Unit is sanctuary based, and therefore provides a nurturing environment which emphasizes treatment. As with all juvenile treatment facilities, the philosophy of this facility is to treat, rehabilitate, and supervise the juvenile offender, and a myriad of programs and services are offered to effectuate this end. This is a secure facility that presently houses about thirty (30) juvenile residents. The entire treatment program is designed to last only nine (9) to twelve (12) months. If

beneficial to her.

[18] This Court notes that Dr. Dattilio, Dr. Berkowitz, nor Dr. O'Brien found the Defendant to suffer from any mental infirmity or disorder recognized by the DSM-V. As the Defendant lacks any recognized diagnosis, her amenability to treatment is beyond questionable.

33

A-34

more treatment is necessary after this period of time, individual counseling could then be provided. Therefore, if a juvenile excelled at the program, she could be recommended for release as soon as nine (9) months. In the within matter, given the Defendant's lack of any recognized mental disorder which would require treatment, as well as her history, it could be expected that the Defendant would excel in any placement and be recommended for release within this brief time frame.

Adelphoi Village, approximately half the size of the North Central Secure Treatment Unit with fourteen (14) residents, offers similar programs to the North Central Secure Treatment Unit. In addition, it offers an on-campus step down program in which the juvenile offender can move to a less restrictive environment. With both of the Pennsylvania secure juvenile facilities, an offender can run out of services by completing the treatment program. After completing the program, the juvenile would then be placed back home, in a new program involving independent living, or in a non-secure step down facility that would have an expiration period. Indeed, a juvenile does not cycle through the program for seven (7) years. Once treatment is completed, supervision is maintained either by the family or the juvenile probation department. However, the longest that any juvenile has ever been placed in either of these juvenile treatment facilities is two and a half (2 ½) years. Consequently, it is more than likely that the Defendant, if placed in one (1) of these Pennsylvania secure treatment facilities, would be released long before she attains the age of twenty-one (21).

34

A-35

As such, this Court finds that the juvenile system is inadequate to supervise, treat or rehabilitate the Defendant. This Court recognizes that juvenile court jurisdiction ends at the age of twenty-one (21) regardless of whether or not the Defendant continues to pose a threat to society. Commonwealth v. Zoller, 345 Pa. Super. 350, 498 A.2d 336, 440 (1985). However, it is more likely than not that this Defendant would be released long before she attains the age of twenty-one (21) years old, as the treatment facilities are designed with a shorter duration of treatment in mind. A period of approximately two and a half (2 ½) years is woefully inadequate to expect that the Defendant would respond to treatment or rehabilitation after committing matricide. (C. Ex. 23).

In contrast, within the adult system, a state correctional institution is available to the Defendant that would suit her needs. Specifically, SCI Muncy is a state correctional facility housing youthful female offenders younger than eighteen (18) years old, and young adult female offenders between the ages of eighteen (18) and twenty-one (21). The juvenile programing within the adult correctional system offered at SCI Muncy mirrors the programming for juvenile offenders offered at both North Central Secure Treatment Unit and Adelphoi Village. William Franz, the Correction Classification Program Manager and SCI Muncy, explained that the youthful offender and young adult prisoners are separated from the general prison population. The Youthful Offender Program offers a great deal of programs designed to be therapeutic in nature. The prisoners in this program meet with their counselors and psychologists daily, and

35

A-36

overall there is great deal of interaction with the staff. In this program, the prisoner would receive an education and be offered programs run by area Universities. Under the Young Adult Offender Program, the prisoner undergoes a five (5) phase program, each phase lasting eight (8) weeks. A young adult prisoner would have the opportunity to participate in a myriad of programs which focus on, *inter alia*, positive relationships, coping skills, decision making and positive self-esteem. Mr. Franz indicated that the programs in SCI Muncy are similar to those offered at North Central Secure Treatment Unit in Danville, Pennsylvania. However, Mr. Franz noted that it is less chaotic at SCI Muncy because they have more options available to them to deal with rule breakers. Consequently, he believed SCI Muncy to be a placement that is more conducive to treatment.

This Court finds that the Defendant has not borne the heavy burden placed upon her to prove that transfer to the juvenile system would serve the public interest. This Court recognizes that the Defendant has no prior record and has never had any prior contact with the juvenile system. While her age, in and of itself, causes consideration by this Court, her age *alone* is the primary factor in favor of decertification. However, this factor is overwhelmingly outweighed by the factors against decertification. In particular, decertification is not appropriate because of the serious nature of the charge and the criminal sophistication exhibited. See Commonwealth v. Aziz, 724 A.2d 371, 379 (Pa. Super. 1999) (seriousness of allegations, failure to respond to previous treatment, significant pattern of violent and escalating criminal behavior justified denying

36

A-37

decertification). In addition, this Court finds that the Defendant's mental capacity is not an issue, except where it plays into her sophistication. The Defendant presented herself as an arrogant, superior, high school student who even referred to herself as a "woman."[19] In short, the Defendant's amenability to treatment, supervision or rehabilitation as a juvenile is suspect at best. Commonwealth v. Austin, 444 Pa. Super. 601, 664 A.2d 597 (1995). Consequently, the Defendant's Motion to Transfer Proceedings to Juvenile Court is denied.

---

[19] Not only did the Defendant call herself a "woman," but she portrayed herself to others as a "woman" as well. The record evidence establishes that the Defendant encouraged the sexual relationship with Co-Defendant Caleb Barnes, regardless of her later attempts to cover it up with the sexual abuse complaint. Also, within the more than 6,000 text messages that this Court tediously reviewed, *many* of which were sexually tawdry and crude, the Defendant presented herself as a grown up. (C. Ex. 8). In both her text messages and on social media websites, the Defendant commented with confidence on her views of the world, science, politics, religion, and morality. (C. Ex. 8).

A-38